

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Brett L. Jou*

**Signed October 26, 2006**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BILLY ARTHUR DODGIN AND | § | CASE NO. 05-21729-RLJ-13 |
| MARY SUE DODGIN, | § | |
| | § | |
| DEBTORS | § | |

## <u>MEMORANDUM OPINION</u>

The Court considers the debtors' objection to the claim of Panhandle Steel Buildings, Inc. ("Panhandle"). Panhandle's claim is premised upon its contention that Bill Dodgin ("Dodgin"), one of the debtors and the sole shareholder of Enercon, Inc. ("Enercon"), is individually liable on an arbitration award issued in favor of Panhandle and against Enercon because Enercon's corporate charter was revoked on June 21, 2001, almost three years prior to the award. Panhandle submits that because Enercon was no longer a valid legal entity on the date that its liability arose (March 25, 2004), Dodgin, as Enercon's sole shareholder, officer and director, is

personally liable for Enercon's debt in accordance with section 171.255 of the Texas Tax Code. Panhandle also alleges, alternatively, that Dodgin is liable under an alter ego theory of liability.

Dodgin denies he is liable for the arbitration award under either theory asserted by Panhandle. Dodgin submits that the arbitration award applies only to Enercon and that he cannot be personally liable as Enercon's corporate charter was reinstated on February 9, 2004, which was before the arbitration award against Enercon, and, regardless, the reinstatement was made effective June 21, 2001. As for the alter ego claim, Dodgin contends that neither the facts nor the law justify imposition of liability under an alter ego theory.

Hearing was held August 22, 2006. The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b); this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). This Memorandum Opinion contains the Court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

### Statement of Facts

1. This chapter 13 bankruptcy case was filed by the Dodgins on October 14, 2005. Panhandle filed its proof of claim on January 25, 2006, asserting an unsecured claim in the amount of $375,600.14. Panhandle's claim amount is derived from an arbitration award issued on March 25, 2004, in favor of Panhandle and against Enercon. The award includes damages of $300,000 and attorney's fees of $67,000. Panhandle claims an additional $8,600 for attorney's fees incurred in attempting to collect the award.

2. Panhandle and Enercon entered into an agreement dated effective May 1, 2001 (the "May 2001 Agreement") that provided that Panhandle, which had entered into a contract with Kennel Kare, Inc. ("Kennel Kare") for the construction of a kennel in Roanoke, Texas, would sell

the Kennel Kare contract to Enercon for $10,000.  The May 2001 Agreement specifically

obligated Enercon to construct the kennel "in a professional manner and . . . according to the

building plans and specifications."  It further provided that Enercon indemnify and hold

Panhandle harmless from claims that may be asserted against Panhandle as a result of any acts or

omissions of Enercon and that Enercon reimburse Panhandle for any out-of-pocket expenses that

might be expended by Panhandle.

    3.  The construction of the kennel began in May of 2001, with the initiation of dirt and

concrete work.  Concerns arose with Kennel Kare regarding whether the construction was being

done in accordance with the plans.  According to Dodgin, in February of 2002, he was made

aware of Kennel Kare's complaints.  He testified that he addressed Kennel Kare's concerns and

that the construction was finalized by March of 2002.

    4.  Kennel Kare was not satisfied with the completed project, however.  As a result of the

disputes that arose concerning the construction, Kennel Kare sued Panhandle, the party with

which it contracted, for breaching the kennel construction contract by failing to build the kennel

in a good and workmanlike manner; Panhandle turned to Enercon.  The dispute between Kennel

Kare, Panhandle, and Enercon was submitted to arbitration before the American Arbitration

Association Construction Industry Tribunal, in arbitration matter number 71Y1100041303

*Enercon, Inc. vs. Kennel Kare, Inc. and Panhandle Steel Buildings, Inc. and Coy Beauchamp*.

The arbitration was conducted in January of 2004 and resulted in the aforementioned March 25,

2004, arbitration award.

    5.  In addition to the award in favor of Panhandle and against Enercon, the arbitrator

directed Panhandle to pay Kennel Kare the sum of $300,000.  Enercon's obligation to Panhandle

was obviously based upon Panhandle's rights of indemnity and reimbursement set forth in the May 2001 Agreement.

6. Enercon is a New Mexico corporation incorporated under the laws of New Mexico on August 23, 1983. Its corporate certificate was revoked on June 21, 2001. From the evidence presented at the hearing, the reason for the revocation of the certificate is unclear. The certificate was reinstated by the Office of the Public Regulation Commission for the State of New Mexico on February 9, 2004, *effective* June 21, 2001.

7. At the time of the May 2001 Agreement, Dodgin was the sole shareholder, officer and director of Enercon. He was the one person "in charge" of the project to build the kennel for Kennel Care.

8. Enercon was originally formed to be a general partner for a limited partnership that was created to build an ethanol plant. From its inception in 1983, Enercon held no directors' or shareholders' meetings. It sold all its assets in 1992; from 1990 to 1997 it conducted no business operations. Dodgin testified that, in 1998, Enercon carried on a farming business and a radon remediation business. Enercon has never formally elected any directors or officers. At present, it has no assets or any semblance of any ongoing activity.

9. Immediately after the arbitration was conducted (January of 2004) and before issuance of the award on March 25, 2004, Dodgin went to New Mexico to have Enercon's corporate certificate reinstated.

10. Dodgin has had numerous personal bills and expenses paid by Enercon during the time frame of April 2003 through August of 2003, including utility bills, insurance, personal business expenses (feed, equipment rental, other farming expenses), medical bills, trips (cruise

with children), expenses on a boat, phone bills, credit cards, and clothes.

11.  On June 28, 2006, at his deposition, Dodgin testified that Enercon had been dissolved.

12.  Dodgin testified at the hearing before this Court that he projected a $125,000 profit on the Kennel Kare project.  The entire project was in the neighborhood of $1.68 million with $1.2 million to be paid to Enercon.  Dodgin testified that Kennel Kare financed the construction through a loan with the Small Business Administration for the $1.68 million.  He further testified that Enercon was paid approximately $1 million on the project.

13.  The arbitration award of $300,000 issued in favor of Kennel Kare and against Panhandle was settled by Kennel Kare and Panhandle.  The settlement provided that Panhandle pay Kennel Kare $52,500 by August 20, 2004, and $7,500 by October 31, 2004.  In addition, Panhandle was required to continue to pursue the arbitration award against Enercon by filing suit against Enercon with any resulting recovery to be divided by the first one-third of any proceeds to be paid to Panhandle's attorneys as attorney's fees and the remaining two-thirds of any recovery to be split one-third to Panhandle and two-thirds to Kennel Kare until Kennel Kare received total payments of $150,000, after which any proceeds would be shared by Panhandle and Kennel Kare on a fifty-fifty basis until the total sum of $300,000 had been received by Kennel Kare; additional proceeds recovered are to be retained by Panhandle.

## Discussion

1.  Claim of Liability from Forfeiture of Enercon's Certificate

Panhandle asserts that Texas Tax Code section 171.255 applies to hold Dodgin personally liable for the arbitration award against Enercon, a New Mexico corporation, because Enercon's

corporate privileges were revoked by the state of New Mexico. Section 171.255 provides as

follows:

> If the corporate privileges of a corporation are forfeited for the failure to file a report or pay a tax or penalty, each director or officer of the corporation is liable for each debt of the corporation that is created or incurred in this state after the date on which the report, tax, or penalty is due and before the corporate privileges are revived....

TEX. TAX CODE ANN. § 171.255 (Vernon 2002). As it was incorporated in New Mexico, Enercon

is a foreign corporation. Article 8.02 of the Texas Business Corporations Act specifically

addresses the liability of directors and shareholders of a foreign corporation under the internal

affairs doctrine, providing as follows:

> A. A foreign corporation which shall have received a certificate of authority under this Act shall, until its certificate of authority shall have been revoked in accordance with the provisions of this Act or until a certificate of withdrawal shall have been issued by the Secretary of State as provided in this Act, enjoy the same, but no greater, rights and privileges as a domestic corporation organized for the purposes set forth in the application pursuant to which such certificate of authority is issued; and, as to all matters affecting the transaction of intrastate business in this State, it and its officers and directors shall be subject to the same duties, restrictions, penalties, and liabilities now or hereafter imposed upon a domestic corporation of like character and its officers and directors; provided, however, that *only the laws of the jurisdiction of incorporation of a foreign corporation shall govern (1) the internal affairs of the foreign corporation, including but not limited to the rights, powers, and duties of its board of directors and shareholders and matters relating to its shares, and (2) the liability, if any, of shareholders of the foreign corporation for the debts, liabilities, and obligations of the foreign corporation for which they are not otherwise liable by statute or agreement*.

TEX. BUS. CORP. ACT ANN. art. 8.02(A) (Vernon 2003) (emphasis added). Although reference is

made to shareholders potentially "otherwise liable by statute," section 171.255 of the Texas Tax

Code does not make Dodgin "otherwise liable" as it applies only to Texas corporations. *See Tri-*

*State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.*, 184 S.W.3d 242 (Tex. App. – Houston [1st

Dist.] 2005, no pet.). Panhandle has not offered any authority holding that the consequences of

- 6 -

the revocation of a foreign corporation's charter are governed by Texas law.  In fact, the only

case found to have discussed this issue held to the contrary.  In *Tri-State*, the Texas Court of

Appeals in Houston reviewed this same argument raised here in relation to a California

corporation whose charter was revoked by the California Secretary of State.  There, the court

stated,

> Chapter 171 of the Tax Code , of which section 171.255 is a part, governs franchise
> taxation *in Texas*. Franchise taxes governed by that chapter are taxes on the privilege
> of transacting business *within Texas*. As Texas courts have recognized, section
> 171.255 is a revenue measure, the purpose of which is to enforce collection of Texas
> franchise taxes.
>
> Although not expressly stated in Chapter 171, it is logical that subsection 171.255(a)
> applies only to corporations that have failed to file a report or to pay a tax or penalty
> as required by Texas law. That is, it follows that subsection 171.255(a) applies when
> a corporation has its corporate privileges forfeited in Texas, not in California. Here,
> NCI has not shown that subsection 171.255(a) applies to Tri-State, a California
> corporation, whose corporate rights and privileges were suspended by California
> authorities for noncompliance with California tax laws. In addition, NCI has not
> offered any evidence showing that Tri-State's corporate privileges have been forfeited
> by Texas authorities for non-compliance with Texas tax law. Thus, we conclude that
> NCI did not meet its burden to show that Hollister and Bush are personally liable
> pursuant to Texas Tax Code subsection 171.255(a) for NCI's claims against Tri-State.

*Id*. at 251 (emphasis in original, internal citations omitted).  NCI, the claimant in *Tri-State*, also

argued that California law supported directors' liability for corporate debts.  *Id*.  The court

disagreed, holding that the California laws did not provide for the directors' liability upon the

forfeiture of corporate privileges.  *Id*. (citing *Bank of America Nat'l Trust & Sav. Assoc. v.

Morse*, 265 Or. 72, 508 P.2d 194, 196 (1973) (holding that California Revenue and Tax Code

section 23301 does not authorize officer liability for corporate debts when corporate powers are

suspended).  Panhandle has not contended that any New Mexico law makes Dodgin personally

liable, and a review of New Mexico laws has not revealed a basis for liability. The New Mexico laws defining the penalties for forfeiture explicitly state that "[w]hen the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative revocation and the corporation resumes carrying on its business *as if the administrative revocation had never occurred*." N.M. STAT. ANN. § 53-17-18 (West 1978) (emphasis added). The penalty under the New Mexico statutes is a $200 civil fine. N.M. STAT. ANN. § 53-5-7 (West 1978).

Panhandle argues that the May 2001 Agreement between Panhandle and Enercon dictates that Texas law applies to determine Dodgin's liability. In this regard, the May 2001 Agreement does state that it "shall be governed by the laws of the State of Texas." The Court rejects Panhandle's argument, however. First, the May 2001 Agreement is between Panhandle and Enercon; Dodgin signed the May 2001 Agreement as president of Enercon. Second, the Court is not deciding if liability arises from a breach of the May 2001 Agreement. The conduct – the acts or omissions – that gives rise to liability under the May 2001 Agreement has previously been determined in the arbitration proceeding. Panhandle seeks here to extend or transfer to Dodgin the liability that has already been determined under the May 2001 Agreement. As set forth above, New Mexico law governs whether Dodgin is liable for Enercon's obligation and provides that the reinstatement of the corporation is effective retroactively to the time of revocation.

2. Claim of Liability Under Alter Ego Theory

As with the above issue regarding the forfeiture of the corporate charter, Panhandle's alter ego claim also raises a choice of law question. Despite this, both parties rely upon Texas law in arguing their respective positions.

The Court finds no reason to stray from the internal affairs doctrine contained at article

8.02 of the Texas Business Corporations Act, which, as discussed above, provides that the laws

of the jurisdiction of incorporation of a foreign corporation govern the liability of shareholders of

the foreign corporation for the debts, liabilities, and obligations of the foreign corporation. TEX.

BUS. CORP. ACT ANN. art. 8.02(A) (Vernon 2003).[1] The Court applies New Mexico law in

determining whether to pierce the corporate veil of Enercon.

     To pierce the corporate veil in New Mexico, a plaintiff must satisfy three requirements: (1)

---

[1]In 2003, the Texas Legislature passed the Texas Business Organizations Code, which recodified the existing statutes governing domestic business corporations, nonprofit corporations, professional corporations, professional associations, and unincorporated nonprofit associations. As a major restructuring of existing statutes and substantive changes to existing law, the effectiveness was delayed until January 1, 2006.

Title One, Chapter One, Subchapter C of the Texas Business Organizations Code is entitled "Determination of Applicable Law," and provides as follows:

§ 1.102. Foreign Filing Entities

If the formation of an entity occurs when a certificate of formation or similar instrument filed with a foreign governmental authority takes effect, the law of the state or other jurisdiction in which that foreign governmental authority is located governs the formation and internal affairs of the entity.

§ 1.104. Law Applicable to Liability

The law of the jurisdiction that governs an entity as determined under Sections 1.101-1.103 applies to the liability of an owner, a member, or a managerial official of the entity in the capacity as an owner, a member, or a managerial official for an obligation, including a debt or other liability, of the entity for which the owner, member, or managerial official is not otherwise liable by contract or under provisions of law other than this code.

TEX. BUS. ORGS. CODE ANN. §§ 1.102, 1.104 (Vernon 2006).

TEX. BUS. ORGS. CODE ANN. § 1.101 (27) "Foreign" means, with respect to an entity, that the entity is formed under, and the entity's internal affairs are governed by, the laws of a jurisdiction other than this state.

The Fifth Circuit has applied both Texas and foreign piercing laws to foreign corporations. *See Alberto v. Diversified Group, Inc.*, 55 F.3d 201 (5th Cir. 1995) (Delware law applied in diversity action in Texas federal court to enforce judgment debts of Delaware corporation against shareholder (entity) incorporated under Louisiana law, relying upon article 8.02 as the applicable conflicts of law rule); *but see Rimade Ltd. v. Hubbard Enterprises, Inc.*, 388 F.3d 138 (5th Cir. 2004) (affirmed opinion of United States District Court, sitting in Texas, that applied, without discussion, the Texas law of veil piercing in action against shareholders of a Tennessee corporation). In *Weaver v. Kellogg*, 216 B.R. 563 (S.D. Tex. 1997), the court held that on an alter ego claim against shareholders and directors of a Delaware corporation, the Texas choice of law rule, article 8.02, dictates that shareholder liability is determined by the law of incorporation. *Id.* at 585.

a showing of instrumentality or domination; (2) a demonstration of improper or fraudulent purpose for incorporation; and (3) proximate causation. *See Jemez Agency, Inc. v. CIGNA Corp.*, 866 F.Supp. 1340 (D. N.M. 1994); *Scott v. AZL Resources, Inc.*, 107 N.M. 118 (N.M. 1988). To satisfy the first element, a plaintiff must show that a company is a mere business conduit for the parent or that there is such unity of interest and ownership that the individuality or separateness of the company and parent has ceased. *Jemez Agency, Inc. v. CIGNA Corp.*, 866 F. Supp at 1344. "'Instrumentality' or 'domination' means proof that the subsidiary or other subservient corporation was operated not in a legitimate fashion to serve the valid goals and purposes of that corporation but it functioned instead under the domination and control and for the purposes of some dominant party. . . . But it also requires a showing that recognition of the separate corporate existence of the two corporations would sanction fraud or other improper purposes." *Scott v. AZL Resources, Inc.*, 107 N.M. at 121.

Under New Mexico law, a determination of alter ego alone is not enough to justify piercing the corporate veil. The New Mexico Supreme Court explained the necessity of going beyond a finding of alter ego.

> Even if we were to agree with the trial court that the subsidiaries here were the alter egos of [the defendant], our inquiry does not end there; we *must still determine whether* [the defendant's] *domination or control was used for fraud or other improper purposes to hold it liable on the theory of piercing the corporate veil.*
>
> *Mere control by the parent corporation is not enough to warrant piercing the corporate veil.* Some form of moral culpability attributable to the parent, such as use of the subsidiary to perpetrate a *fraud is required*. Therefore, in fairness to the parent and to support the policy of limited liability [of a corporation], improper purpose must be established before the parent . . . can be found liable.

*Scott v. AZL Resources, Inc*., 107 N.M. at 122 (emphasis added).

The second element, improper or fraudulent purpose for incorporation, may be determined by an analysis of undercapitalization, sham formalities or formation, or fraudulent manipulation or mismanagement resulting in losses. *Jemez* 866 F.Supp at 1345. The concurring opinion from *Garcia v. Coffman*, 124 N.M. 12 (N.M.App. 1997) gave a brief review of other New Mexico cases regarding improper or fraudulent purpose and said:

> [T]he requirement that there be an improper purpose before the corporate veil can be lifted should not be satisfied by just the fact that the corporation engaged in misconduct. As I understand the purpose of the doctrine, a court should be able to pierce the corporate veil only when the improper conduct was facilitated by the use of the corporate form-rather than, say, a sole proprietorship or a partnership-to conduct business. *State Trust & Sav. Bank v. Hermosa Land & Cattle Co.*, 30 N.M. 566, 577, 240 P. 469, 473 (1925), spoke of application of the doctrine to "cases in which corporate organization was resorted to to accomplish fraud, or to defeat public justice or to circumvent statutes. . . " Similarly, *Kutz Canon Oil & Gas Co. v. Harr*, 56 N.M. 358, 367, 244 P.2d 522, 527 (1952), said: "[W]here corporate entity is employed as a shield to defraud creditors or otherwise perpetrate frauds, the veil of corporate existence will be drawn aside and liability imposed on its stockholders as though there were no corporate existence."

*Id*. at 22-23. Few New Mexico cases have addressed veil piercing and those that have offer little explanation of the second element. The New Mexico Supreme Court in *Scott v. AZL Resources, Inc*. said that "[o]nly under special circumstances will the courts disregard the corporate entity to pierce the corporate veil holding individual shareholders or a parent corporation liable. This is done where the corporation *was set up for fraudulent purposes* or where to recognize the corporation would result in injustice." *Scott v. AZL Resources, Inc*., 107 N.M. at 121 (emphasis added).

The final element, proximate causation, has also received scant discussion by the New Mexico courts. One case had the following to say: "[u]nder the proximate cause test, '[i]t is sufficient to show some knowing or cooperative effort between the related parties which results

in unjust injury to the plaintiff, even though it may not be possible to prove that the defendant's control directly caused the plaintiff's injury.'" *Farmers Alliance Mut. Ins. Co. v. Naylor*, 2006 WL 2720640, *8 (D. N.M. 2006) (citing *Coffman v. Garcia*, 124 N.M. 12 (N.M. App. 1997)).

Panhandle has conceivably demonstrated some evidence of alter ego through Dodgin's payment of personal bills with corporate checks. This, however, is insufficient under New Mexico law to pierce the corporate veil. New Mexico case law requires a showing of fraud, which has not been demonstrated here. Panhandle has not shown that recognition of Enercon's separate existence would sanction fraud or any improper purpose. Enercon's lack of capital and assets at the time the 2001 Agreement was negotiated does not rise to the level of fraud. Dodgin testified that a profit in excess of $100,000 was anticipated from the project. The Court believes this was a reasonable projection and defeats any claim that Enercon or Dodgin defrauded Panhandle at the time the 2001 Agreement, and thus the indemnity provision, was entered into.

Enercon existed for many years prior to any relationship with Panhandle; the evidence does not establish that Dodgin created Enercon to perpetuate a fraud. New Mexico law favors the recognition of corporate separateness and stresses that it will be set aside only under circumstances in which the evidence shows the corporation was "set up for fraudulent purposes." *Id*. Panhandle also failed to demonstrate any causal connection between Enercon's separate existence and its inability to cover any claim arising under the indemnity agreement. No "cooperative effort" resulting in Panhandle's injury was shown.

The Court reaches the same result applying Texas law. Section 21.223 of the Texas Business Corporations Act states in relevant part as follows:

A. A holder of shares, an owner of any beneficial interest in shares, or a subscriber

for shares whose subscription has been accepted, or any affiliate thereof or of the corporation, shall be under no obligation to the corporation or to its obligees with respect to:

. . .

(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder, owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate *an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate*;

TEX. BUS. CORP. ACT ANN. art. 2.21 (Vernon 2003) (emphasis added). The burden of proof is on the party seeking to disregard the corporate existence. *In re Sims*, 994 F.2d 210, 217 (5th Cir. 1993) (citing *In re Multiponics, Inc.*, 622 F.2d 709, 723 (5th Cir.1980)); *see also Goldstein v. Mortenson*, 113 S.W.3d 769 (Tex. App. – Austin 2003, no pet.). Under article 21.223, a showing of actual fraud is required to pierce the corporate veil. *Menetti v. Chavers*, 974 S.W.2d 168, 174 (Tex. App. – San Antonio 1998, no pet.). "Actual fraud in the corporate-veil context involves 'dishonesty of purpose or intent to deceive.'" *Id*. (citing *Castleberry v. Branscum*, 721 S.W.2d 270, 273 (Tex.1986)). In addition, article 21.223 requires that the claimant show "actual fraud on the obligee primarily for the direct personal benefit of the holder." As set forth above, the facts of this case do not warrant a finding of fraud, much less fraud committed by Dodgin against Panhandle for Dodgin's personal benefit.

## Conclusion

Upon the foregoing, the Court concludes that Dodgin is not personally liable to Panhandle for the arbitration award issued against Enercon. Panhandle's claim will be

disallowed.

### End of Memorandum Opinion ###